# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| KRI Investments Limited Partnership, | Civil No. 12-1583 (DWF/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM** |
| | **OPINION AND ORDER** |
| Country Mutual Insurance Company, | |
| Defendant. | |

---

John H. Faricy, Jr., Esq., and Vadim Trifel, Esq., Faricy Law Firm, P.A., counsel for Plaintiff.

Andrew D. Deutsch, Esq., Leatha G. Wolter, Esq., and Kathleen M. Ghreichi, Esq., Meagher & Geer, PLLP, counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Defendant Country Mutual Insurance Company ("Country Mutual") (Doc. No. 51); and a Motion for Partial Summary Judgment brought by Plaintiff KRI Investments Limited Partnership ("KRI") (Doc. No. 56). For the reasons stated below, the Court grants in part and denies in part Country Mutual's motion, and denies KRI's motion.[1]

---

[1]    This Memorandum Opinion and Order is a full version of the Order issued on November 18, 2013. (Doc. No. 78.)

# BACKGROUND

KRI owns commercial property in Newport, MN (the "Property"), which it rents to multiple tenants.  Richard Werner is the president and a limited partner of KRI, and Kathleen Werner is the secretary and a limited partner of KRI.  (Doc. No. 33, Ghreichi Aff. ¶ 3, Ex. 2 ("R. Werner Dep.") at 6-8; Ghreichi Aff. ¶ 4, Ex. 3 ("K. Werner Dep.") at 11, 15-16.)  R&R Rentals, Inc. ("R&R Rentals") is the general partner of KRI; Richard Werner is CEO and the sole shareholder of R&R Rentals.  (R. Werner Dep. at 7-8.)  Both KRI and R&R Rentals operate out of the Werner's home.  (K. Werner Dep. at 24.)

## I.  The Policy

Country Mutual issued property insurance coverage (the "Policy") for the Property.  (Doc. No. 4, Ex. 1 (the "Policy").)  The parties cite to the following portions of the Policy:

### A.  Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
. . .

### E.  Loss Conditions
. . .

#### 4.  Loss Payment

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:
  **(1)** Pay the value of the lost or damaged property;
  **(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;
  **(3)** Take all or any part of the property at an agreed or appraised value; or
  **(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject

to **b.** below.

. . .

**G.      Optional Coverages**

. . .

        **3.      Replacement Cost**

      . . .

            **e.**      We will not pay more for loss or damage on a replacement cost basis than the least of **(1), (2),** or **(3)**, subject to **f.** below:

                **(1)**      The Limit of Insurance applicable to the lost or damaged property;

                **(2)**      The cost to replace the lost or damaged property with other property;

                    **(a)**      Of comparable material and quality; and

                    **(b)**      Used for the same purpose; or

                **(3)**      The amount actually spent that is necessary to repair or replace the lost or damaged property.

      . . .

            **f.**      The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

(Policy at 24, 33, 36-37.)

**BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM**
. . .

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration.". . .

. . .

**F.     Definitions**

. . .

**3.**     "Period of Restoration" means the period of time that:

. . .

       **b.**     Ends on the earlier of:
          **(1)**     The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or
          **(2)**     The date when business is resumed at a new permanent location.

(Policy at 38, 45.)

## CAUSES OF LOSS - SPECIAL FORM

**A.     Covered Causes of Loss**

When Special is shown in the Declarations, covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:

1.     Excluded in Section **B**., Exclusions; or

2.     Limited in Section **C**., Limitations;

that follow.

. . .

**E.     Additional Coverage - Limited Coverage For "Fungus", Wet Rot. Dry Rot And Bacteria**
   . . .

**2.**     We will pay for loss or damage by "fungus", wet or dry rot or bacteria.  As used in this Limited Coverage, the term loss or damage means:
       **a.**     Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

        **b.**      The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

        **c.**      The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

. . .

(Policy at 67, 73.)

    **J.**     The **Ordinance Or Law** Exclusion is replaced by the following exclusion:

**ORDINANCE OR LAW**

The enforcement of any ordinance or law:

    1.     Regulating the construction, use, or repair of any property . . .

. . .

But if loss or damages is solely a result of one or more Covered Causes of Loss, we will pay for your compliance with such ordinance or law, subject to all other provisions of this policy, including those listed below, as follows:

. . .

    **c.**     We will not pay under this provision for:

. . .

        **(2)**    The costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

(Policy at 51-52.)

We will not pay for any loss or damage if any insured has:

**1.**     Before a loss, willfully; or

**2.**     After a loss, willfully and with intent to defraud; concealed or misrepresented any material fact or circumstances concerning:
(a)     This Coverage Part;
(b)     The Covered Property;
(c)     That insured's interest in the Covered Property; or
(d)     A claim under this Coverage Part.

(Policy at 50.)

## II.     The Loss

On June 25, 2010, the Property sustained damage from a severe storm that produced a tornado, hail, and wind. (Doc. No. 1, Compl. ¶¶ 2, 6; Doc. No. 29, R. Werner Aff. ¶¶ 1-3.) KRI hired Mastercraft, a general contractor, to conduct the repairs the day after the storm. (R. Werner Dep. at 15-16.)[2] KRI submitted a claim for loss resulting from the storm, including: (1) loss to the building structure and other items; (2) lost business income for KRI's inability to collect rent from commercial tenants whose units were unusable; and (3) damages to personal business property. Country Mutual paid KRI $605,363.65 for structural repairs to the building and $50,000.82 for lost business income. (Ghreichi Aff. ¶¶ 5, 6, Exs. 4, 5.) In addition, Country Mutual paid KRI $12,483.24 for damage to personal business property pursuant to a release and settlement,

---

[2]     A dispute arose over KRI's alleged refusal to pay Mastercraft for work performed, and Mastercraft recorded a mechanic's lien against the Property in the amount of $140,983.31. (Ghreichi Aff. ¶ 7, Ex. 6.) KRI initiated a separate suit against Mastercraft, alleging, among other things, incomplete and defective work. (*Id*. ¶ 8, Ex. 7 at 16.) Ultimately, the Mastercraft case settled. (R. Werner Dep. at 24.)

which was executed before KRI brought the present action. (Doc. No. 54, Ghreichi Decl. ¶ 2, Ex. B.)

From September 2010 through January 2011, the Cottage Grove Building Official issued letters of approval, certifying that various units in the Property were "compliant with the minimum requirements of all state and local construction standards regulating building construction and use." (Ghreichi Aff. ¶ 10, Ex. 9.) On September 22, 2011, counsel for KRI demanded an additional $346,000 in coverage from Country Mutual for forty-three items of loss allegedly caused by the June 2010 storm. (Doc. No. 28, Trifel Aff. ¶ 2, Ex. A ("Demand Letter").) Country Mutual refused KRI's demand, and KRI initiated the present action.

In this lawsuit, KRI challenges the amount of coverage provided by Country Mutual. Specifically, KRI maintains that Country Mutual failed to provide proper coverage by not fully compensating KRI for its losses. (Compl. ¶ 8.) KRI commenced an action in Ramsey County District Court, asserting five causes of action: (1) declaratory relief (duty to provide coverage); (2) breach of contract; (3) intentional and/or negligent misrepresentation; (4) bad faith/breach of fiduciary duty; and (5) tortious breach of the implied covenant of good faith and fair dealing. (*See generally* Compl.) Country Mutual removed the matter to this Court. (Doc. No. 1.) By Order dated December 18, 2012, the Court dismissed KRI's non-contractual claims— misrepresentation, breach of fiduciary duty, and tortious breach of the implied covenant of good faith and fair dealing. (Doc. No. 25.) Thus, the only remaining claims are for declaratory relief and breach of contract (Counts One and Two).

Country Mutual argues that it has complied with its obligations under the Policy and moves for summary judgment seeking dismissal of KRI's Complaint in its entirety. KRI moves for partial summary judgment, arguing that, as a matter of law, Country Mutual must provide coverage:  (1) to pay for mold testing and remediation inside the building; and (2) to reimburse KRI for lost business income occurring after December 2010.  The Court considers the merits of both motions below.

## DISCUSSION

## I.    Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary

judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Under Minnesota law, general principles of contract interpretation apply to insurance policies. *Progressive Specialty Ins. Co. v. Widness*, 635 N.W.2d 516, 518 (Minn. 2001). The insurance contract is construed as a whole, with unambiguous policy language given its plain and ordinary meaning. *St. Paul Fire & Marine Ins. Co. v. Futura Coatings, Inc.*, 993 F. Supp. 1258, 1261 (D. Minn. 1998). Ambiguous language is construed against the insurer. *Progressive Specialty Ins. Co.*, 635 N.W.2d at 518. "While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." *Travelers Indem. Co. v. Bloomington Steel & Supply Co*., 718 N.W.2d 888, 894 (Minn. 2006). Exclusions from coverage "are construed narrowly and strictly against the insurer." *Id*.

## II.     Coverage Disputes

This case hinges on numerous disputes over whether Country Mutual has met its obligations under the Policy. The Court addresses each dispute in turn.

### A.     Roof

Prior to the 2010 storm, the Property had an EPDM roof with elastomeric coating. (Compl. ¶ 28; Doc. No. 28, Trifel Aff. ¶ 9, Ex. H ("Elliott Dep.") at 17.) Due to damage from the storm, that roof had to be replaced.

Under the Policy, and in the event of covered loss or damage, Country Mutual is obligated to either: (1) pay the value of lost or damaged property; (2) pay the cost of

repairing or replacing the lost or damaged property (subject to other provisions); (3) take all or any part of the property at an agreed or appraised value; or (4) repair, rebuild or replace the property with other property "of like kind and quality." (Policy at 33.) KRI maintains that Country Mutual had an obligation to replace the roof with a roof of "like kind and quality." However, it is clear from the language of the Policy that the obligation to "repair, rebuild or replace the property with other property of like kind and quality" only applies if Country Mutual does the repairing, rebuilding, or replacing. Under the Policy, Country Mutual could also elect (at its option) to "[p]ay the cost of repairing or replacing the lost or damaged property." (*Id*.) Here, Country Mutual paid the cost to replace the roof, and therefore the replacement provision applies. That provision, in turn, requires that Country Mutual pay the cost to "replace the lost or damaged property with other property . . . [o]f comparable material and quality" and "[u]sed for the same purpose." (Policy at 36-37.)

Mastercraft, the general contractor hired by KRI to handle the building repairs, submitted two bids for the roof repairs. (Elliott Dep. at 16-18.) The bids included one for $158,000 by Ryan Roofing and one for $164,870 by Twin City Roofing Construction Specialists, Inc. (Doc. No. 28-1 at KRI000122-16, 129-30.) Country Mutual rejected the bids. (R. Warner Dep. at 15-16; Elliot Dep. at 18-19.) Country Mutual asserts that it rejected the bids because they included repairs that went beyond what was damaged and included a thicker membrane. (Elliott Dep. at 20.) On or about July 15, 2010, Country Mutual received a bid to replace the roof for $74,400 from Thurnco, Inc. (*Id*. at 33-34.) Country Mutual approved the bid. (*Id*. at 35; Ghreichi Aff. ¶ 6, Ex. 5 at 51.) The

Thurnco bid included "removal of the existing EPDM membrane and insulation on the roof, and replacement of damaged insulation and installation of a mechanically-adhered, white EPDM membrane roof system per the manufacturer's specifications." (Doc. No. 39, Thurnblom Decl. ¶ 5.) The bid did not include any amount for an elastomeric coating. (*Id*. ¶ 7.) However, Country Mutual added $28,000 for elastomeric coating plus overhead and profit. (Ghreichi Aff. ¶ 6, Ex. 5 at 51; Elliott Dep. at 42-46.) Mastercraft provided Country Mutual with the price of the coating. (Elliot Dep. at 45.)

After the bid was approved, Mastercraft retained Ryan Roofing instead of Thurnco. (R. Werner Dep. at 92-94; Elliott Dep. at 40.) There is record evidence that Ryan Roofing was retained by Mastercraft at the request of Richard Werner. (R. Werner Dep. at 92-94; Elliott Dep. at 40.)[3] Ryan Roofing, however, did not install an EPDM mechanically-adhered roof sealed with elastomeric coating. Instead, Richard Werner consulted with Ryan Roofing and decided that it would be better to use asphalt shingles. (R. Werner Dep. at 108, 125-26.) Werner also knew that Ryan Roofing would not apply a coating because it "didn't have the money from the insurance company to put the coating on." (*Id*. at 98.) KRI now alleges that the new roof is not of the quality and kind as the original roof and that the new roof has caused water leaks on the Property. (Compl. ¶¶ 35, 36.)

---

[3]     Richard Werner testified that he wanted Ryan Roofing to do the work because it was a tenant in his building and it had put the temporary roof on the night of the storm, and because it "appeared as though [it was] going to be following through and doing the right kind of job." (R. Werner Dep. at 94.)

After a careful review of the record, the Court concludes that there are no genuine issues of fact to be decided at trial with regard to KRI's claim that Country Mutual breached the Policy with respect to the covered roof repairs. Instead, the record establishes that Country Mutual paid approximately $125,000 for the roof repairs— an amount that was meant to cover both the EPDM-membrane roof and elastomeric coating. The record also reveals, however, that KRI chose instead to have Ryan Roofing do the repair work and to install a different type of roof than the one bid on. On the facts in the record before the Court, no reasonable juror could conclude that Country Mutual failed to perform its obligations under the Policy with respect to the roof.

## B. Windows

KRI claims that there were no problems with the fifty-three windows on the Property prior to the storm, and that all fifty-three of the windows on the Property were damaged by the storm. (Demand Letter at KRI000021 (Item 2).) Plaintiff seeks $19,187.63 of coverage under the Policy to replace all of the windows. (*Id*.) Country Mutual asserts that KRI has not put forth any admissible evidence to show that the storm caused damage to the windows and cannot establish that Country Mutual owes any amount of coverage to replace the windows.

In support of its claim for window replacement, KRI submits the Demand Letter, as well as the Expert Report of Clifford A. Olson. (Doc. No. 54, Ghreichi Decl. ¶ 6, Ex. F at 2.) Olson opined that the window damages total $12,099.00. (*Id*.) Olson's report with respect to the window damage reads as follows:

> There are 25 windows (2 panes ea) on the second lever [sic] and 38 windows on the lower level. Prior to the storm there were no problems with the windows. The Insurance company engineer incorrectly made the statement that "Double images on glazing are the result of coatings applied to the glass surfaces." It must be noted that there were no coatings applied to the glass. (The Owner has saved the glass for further inspection where one can see that there is no coating on the glass.) The windows have thermal pane glass and the pressure from the storm on 6-25-10 caused the glass to flex and they lost their seals. . . .

(*Id*.) KRI points to evidence, such as the affidavit testimony of Richard Werner, to establish that the windows were not damaged prior to the storm. (*See, e.g.*, Werner Aff. ¶ 5 (asserting that the windows were not distorted, wavy or cloudy before the storm).)

Country Mutual relies on two independent engineering reports from experts it consulted. First, Building Envelope Consultants, Ltd. ("BEC"), explained that the upper level windows were of 1970's vintage and the lower windows were approximately 20 years old. (Doc. No. 28, Trifel Aff. ¶ 12, Ex. K at CMIC000962.) After visual inspection of all the windows, BEC concluded, in part:

> None of the subject windows appeared to have been damaged as a direct result of the reported storm. Thermal pane windows do not have an open-ended service life. Thermal pane service lives are typically benchmarked against their warranty period. It is typical, with modern window manufacturing techniques and materials, to expect a service life of about fifteen-twenty years for thermal pane seals. The windows on the upper level were certainly beyond that anticipated service life and failed due to normal wear and tear.

> The double image reflected in the lower units was also not the result of the reported storm. Double images on glazing are the result of coatings applied to the glass surfaces. It did not appear the glass had a field-applied coating and which surface a coating (such as Low-e) was applied to during manufacture could not be determined without knowing the glass manufacturer. In any event, the double image was not the function of any

> change in the glazing or frame the result of storm activity but the result of a coating application.
>
> The double images and failed window seals were existing conditions that were not caused as a direct result of the reported storm event.

(*Id.* at CMIC000963.) Country Mutual's expert Mark Chauvin also testified that "seal failures . . . to my knowledge, are not associated with wind events to the extent of 50, 60 miles an hour unless the window actually completely shatters or is impacted." (Ghreichi Decl. ¶ 5, Ex. E ("Chauvin Dep.") at 63.)

Country Mutual argues that KRI has failed to offer expert testimony demonstrating causation, and points out that Olson's opinion was based on the inspection of only one window and was made despite having no knowledge of the age of the windows. (Ghreichi Decl. ¶ 4, Ex. D ("Olson Dep.") at 63, 65-67.)

The Court notes that the record support for KRI's claim that the storm caused damage to all fifty-three windows on the Property so as to require replacing all of them is weak. Even so, a reasonable juror could conclude that the storm caused damage to the windows, and it will be up to a jury to decide the extent, if any, of damage to the windows that can be attributed to the storm. Thus, the Court denies Country Mutual's motion for summary judgment as it pertains to KRI's claim for window damage under the Policy.

### C.    Additional Items

KRI seeks payment for several uncompleted structural repairs due to damage to HVAC units, bathroom vanities, wallpaper/paneling, light fixtures, an attic scuttle hole, awnings, and drains. The Court addresses each in turn.

*1.*    *HVAC*

The Property had three rooftop HVAC units.  KRI asserts that Country Mutual paid KRI $14,414 to reimburse KRI for damage to the south HVAC unit; that Craig Elliott at Country Mutual approved payment of $3,950 for damage to a second (the middle) unit; and a third (north) unit sustained the same damage as the south unit and therefore must be replaced at a cost of $14,414.  (Demand Letter at KRI000023 (Item 10).)  The parties dispute whether KRI has submitted sufficient proof that the middle and north units sustained damage in the June 2010 storm.  KRI points to testimony given by Richard Werner.  For example, Richard Werner stated:  "There is the north unit, the third unit, which was damaged by the storm.  It's evidenced by just looking at it from the ground.  The coils are all smashed by the hail."  (R. Werner Dep. at  44.)  In addition, KRI's expert noted the following:  "The damage I saw was – on the units was hail damage" . . . "[d]ents and stuff."  (Olson Dep. at 32.)  KRI's expert also testified that, beyond noticing the hail damage, he relied on information he received from Richard Werner.  (*Id*. at 33.)  Country Mutual points out that there is no evidence that the units were tested for functionality after the storm.

On the record before the Court, there are no fact issues as to whether KRI is entitled to coverage under the Policy to replace or repair the middle and north HVAC units.  KRI has not pointed to sufficient evidence to connect any damage to these units to the storm, and no reasonable juror could conclude that Country Mutual is obligated under the Policy to repair or replace the two additional HVAC units.  Country Mutual is entitled to judgment on this claim.

### 2. *Bathroom Vanities*

KRI seeks $450 to replace the bathroom vanities in the men's and women's restrooms. (Demand Letter at KRI000023 (Item 15).) Country Mutual argues that KRI has not presented evidence of damage.

When asked at his deposition about the damage to the vanities, Richard Werner testified as follows:

> The vanities had particle board or Masonite on the side walls and on the base of it. As the water came through the roof, it splashed down and splashed on there, causing it to separate, and on the side part and on the bottom it dissolved – when the water came in contact with the particle board, it dissolved and had to be replaced. There was an attempt made to repair them. That attempt was unsatisfactory in its end result.

(R. Werner Dep. at 147.)

The Court concludes that KRI has submitted sufficient evidence to raise a fact issue as to whether KRI is entitled to $450 under the Policy to replace the vanities.

### 3. *Wallpaper/Paneling*

KRI claims that Country Mutual owes additional money to replace wall paneling ($10,600) and wallpaper ($3,982.81). (Demand Letter at KRI000025-26 (Items 17 &18).) Country Mutual asserts that there is no evidence that the rooms had wallpaper or paneling prior to the storm. In addition, Country Mutual points to testimony by KRI's expert which it claims suggests that the wallpaper and paneling work relates to work for which Country Mutual paid, but that KRI simply failed to perform.

KRI only briefly mentions the damage to wallpaper and paneling in its opposition, simply citing Richard Werner's testimony to support its claims:

> There was paneling in several of the rooms, including the post office, that
> was removed and not replaced.  There was paneling and wallpaper . . .
> [p]artially completed.  The paneling was not reinstalled.

(R. Werner Dep. at 34, 38 (noting that wallpapering was completed in certain units).)

Based on its review of the record, the Court concludes that there are no fact issues as to whether KRI is entitled to coverage under the Policy to replace or repair wallpaper and paneling.  KRI has not pointed to sufficient evidence to connect any damage to these items to the storm or to demonstrate that any such repair work was not encompassed by the work already paid for by Country Mutual.  Thus, no reasonable juror could conclude that Country Mutual is obligated under the Policy to provide further coverage to replace or repair wallpaper and paneling.  Country Mutual is entitled to judgment on this claim.

### 4.    *Scuttle Hole*

KRI seeks $1,200 to make an undersized attic scuttle hole code compliant. (Demand Letter at KRI000030-31 (Item 29).)  KRI represents:

> The Contractor had to remove and replace the ceiling sheet rock on the
> second level and should have notice [sic] that the scuttle hole was under
> sized.  The scuttle hole measures 13 inches wide and 31 inches long after
> the sheet rock has been installed on the sides of the opening[.]  The
> Building Official wants it to be enlarged so that it meets the minimum of
> 22 inches wide and 30 inches long.

(*Id*.)  The record demonstrates that this particular item is the result of a deficient repair by the contractor, and not itself due to storm damage.  (Olson Dep. at 88.)  Thus, it is not a direct physical loss under the Policy, and Country Mutual has no obligation to repair or replace the scuttle hole.

5.      *Awnings*

KRI asserts that the awnings on the east side of the Property were damaged in the storm and seeks $11,206.20 in damages.  (Demand Letter at KRI000033 (Item 38).) Country Mutual argues that KRI has submitted no proof that the awnings were damaged by the storm and that photographs taken after the storm show that the awnings were not damaged.  (Ghriechi Decl. ¶ 9, Ex. I at 18-19, Figs. 18-20.)  KRI did not discuss the damage to the awnings in its opposition to Country Mutual's motion for summary judgment, but simply cites to the testimony of Richard Werner:

> I contended that the awnings were damaged by the storm.  And I furnished Mastercraft a panel from the awning that showed the hail damage to the awning.  And I asked them to forward it on to the insurance company.  I don't know if they have forwarded it . . .
>
> [Q: . . . Have you ever claimed Mastercraft damaged the awnings? . . . ]
>
> I claim that, after the storm, the awnings were damaged.  And they increased the damage to them by their handling of the material they were removing from the building.  They were throwing Sheetrock and stuff out of the building.  I stopped them from doing that and told them that they had to get some kind of device to prevent additional damage to the awning.

(R. Werner Dep. at 77-78.)

Based on the record, the Court concludes that there are no fact issues as to whether KRI is entitled to damage under the Policy to replace awnings.  KRI has not pointed to sufficient evidence to connect any damage to the awnings to the storm.  Thus, no reasonable juror could conclude that Country Mutual is obligated under the Policy to replace the awnings, and Country Mutual is entitled to judgment on this claim.

### 6. Lighting

KRI asserts that light fixtures in "Room '260 and stair' have had water in them and need to be replaced." (Demand Letter at KRI000030 (Item 26).) In support, KRI submits a photograph taken by Richard Werner purporting to show the fixtures having water stains. (Ghreichi Decl. ¶ 9, Ex. I at 17 – Fig. 16; R. Werner Dep. at 43, 64-65.) However, Country Mutual contends that the photograph does *not* show any obvious staining, that KRI's expert acknowledges that the light fixtures work, and submits that even if there is staining, there is no proof that the staining was caused by the storm and not, for example, by leaks caused by Ryan Roofing's faulty roof repair.

Based on the record, the Court concludes that there are no fact issues as to whether KRI is entitled to damages under the Policy to replace the light fixtures. KRI has not submitted sufficient evidence to connect any damage to the light fixtures to the storm, and no reasonable juror could conclude that Country Mutual is obligated under the Policy to provide coverage to replace the light fixtures. Country Mutual is entitled to judgment on this claim.

### 7. Drains

KRI seeks $1,765 to clean out the sewer drains in the building, asserting that the storm caused "water, mudding, dirt, and other debris to plug the drain." (Demand Letter at KCI000033 (Item 39).) Country Mutual claims that there is no evidence that the storm caused the drain problems and that there is evidence in the record that clogging was an issue in the Property prior to the storm. (Ghreichi Decl. ¶ 9, Ex. I at 20-21, Figs. 23-24.) Country Mutual also claims that there is evidence that debris was placed in the drains by

Mastercraft during the repair work. (Olson Dep. at 47-48, 93.) KRI responds by arguing that the clogged drains were repaired on the Property prior to the storm and then damaged again during the storm.

Based on the record, the Court concludes that there are no fact issues as to whether KRI is entitled to damages under the Policy to unclog the drains. KRI has not submitted sufficient evidence to connect any drain clogging to the storm, and no reasonable juror could conclude that Country Mutual is obligated under the Policy to provide coverage to repair the drains. Country Mutual is entitled to judgment on this claim.

### D. Lost Business Income

The Policy provides that Country Mutual must pay for the "actual loss of Business Income" sustained by KRI due to the necessary suspension of operations during the "period of restoration." (Policy at 38.) The "period of restoration" is defined as ending on the earlier of: (1) the date when the Property should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) the date when business is resumed at a new permanent location. (*Id*. at 45.)

There is no dispute that Country Mutual paid for all of KRI's claimed lost rent through the end of December 2010. This totaled roughly $50,000 for a six-month period ending on December 31, 2010. (Ghriechi Aff. ¶ 11, Ex. 10 at 3; Doc. No. 33-4.) KRI asserts a claim for coverage for loss of business income after December 31, 2010. Thus, the issue before the Court involves the date when the Property "should [have been] repaired, rebuilt or replaced with reasonable speed and similar quality."

Country Mutual asserts that the "period of restoration" ended on

December 31, 2010, because that was the date on which all repairs were or could have

reasonably been completed. In support of its position, Country Mutual asserts that

Mastercraft determined that repairs would be completed by December 31, 2010. (Elliott

Dep. at 53-54.) Specifically, Country Mutual points to the deposition testimony of Craig

Elliott of Country Financial who testified that, based on what he was told by Mastercraft,

his position was that the repairs should have been completed by the end of

December 2010. (*Id.*) Moreover, a representative of Mastercraft testified that when KRI

asked Mastercraft to stop work on the property, only minor "touch up" repairs were yet to

be completed. (Doc. No. 65, Deutsch Decl. ¶ 8, Ex. 7 ("Benson Dep.") at 85, 87.)[4]

KRI, however, submits that the only reliable information as to when the repairs

would be completed comes from Richard Werner, who in a letter to Country Financial

dated November 18, 2010, stated: "We expect to be working on the [Property] well into

February or March [of 2011]. Everything is complete with the exception of Suite 152

and the far north Suite 160." (Trifel Aff. ¶ 10, Ex. J.)

The Court concludes that viewing the record in the light most favorable to KRI, no

reasonable juror could conclude that Country Mutual had an obligation to KRI to provide

---

[4]      KRI argues that this information is hearsay. The Court disagrees. The
information that Elliott claims was provided by Mastercraft (regarding the repairs being
completed by December 31, 2010) is not being offered to prove that the repairs were,
indeed, completed by that day; instead, that information is being offered as proof as to
when the repairs could have reasonably been completed.

coverage for lost business income after December 31, 2010. Instead, the record supports the conclusion that all repairs to the Property could have reasonably been completed by December 31, 2010. Therefore, Country Mutual is entitled to judgment on KRI's claim for coverage for lost business income after December 31, 2010.[5]

### E.    Release—Business Property Claims

KRI asserts that Country Mutual breached the Policy by failing to provide coverage for certain business personal property claims, such as planters, wall hangings, and the cost of moving tenants' personal effects. Country Mutual asserts that these claims were released when the Werners signed a Commercial Business Personal Property Release, under which the Werners received $12,483.24 in consideration for their release of Country Mutual "from any and all claims, demands or suits of any kind on account of and resulting from damage to [Business Personal Property] insured" under the Policy caused by the June 2010 storm. (Ghreichi Decl. ¶ 2, Ex. B.) KRI argues that the Business Personal Property Release does not cover the items in dispute because the

---

[5]    The Court notes that Country Mutual has raised several issues regarding the propriety of KRI's request for lost income; namely that KRI has received rent payments from tenants during the period for which Country Mutual provided reimbursement for lost rents; and that KRI seeks additional lost income payments for units that were vacant when the storm occurred and for units in which tenants were paying rent or were approved for occupancy. Indeed, Country Mutual argues that KRI's misrepresentation in submitting its claim for lost rental income voids the Policy. While the Court does not reach this issue with respect to lost income because KRI's claim for additional lost rental income fails for the reasons discussed above, the Court notes that the allegations of misrepresentation and double recovery are troubling. Should this case be put before a jury, the Court is inclined to allow Country Mutual to assert the misrepresentation and concealment provision in the Policy as a defense.

release does not specifically mention planters, wall hangings, or costs associated with moving tenants' personal effects.

The Policy provides "Building" coverage for personal property that is owned by the insured and used to maintain or service the building. (Policy at 24.) All other "personal property" owned by the insured and used in the insured's business constitutes "Business Personal Property." (*Id.*) The planters and wall hangings are not used to maintain or service the building. The Court concludes, therefore, that they constitute Business Personal Property and fall within the terms of the Release. In addition, the claim for removal of tenants' personal effects does not fall within coverage for damage to "Personal Property of Others." Therefore, Country Mutual is not obligated to reimburse KRI for costs associated with moving those items.

### F.    Mold

KRI asserts that Country Mutual breached the Policy by failing to provide coverage for mold testing and, if necessary, remediation. Country Mutual asserts that the $605,363.65 that it paid KRI for structural damage to the building included amounts for water and mold remediation and that what KRI actually seeks is additional coverage for mold testing that is not covered by the Policy.

The record reveals that Country Mutual paid $54,744.47 for mitigation and temporary repair to the Property. (Deutsch Decl. ¶ 2, Ex. 1.) This included the use of dehumidifiers and fans, water extraction, and more than $14,000 for the application of anti-microbial agents and cleaning by a remediation technician. (*Id.* ¶ 3, Ex. 2.) Country Mutual submits that it paid for remediation and mold resulting from the storm as part of

23

the $605,000 paid for structural repairs and that it remediated mold when it was

discovered during the course of repairs. (Trifel Aff. ¶ 5, Ex. D ("Kostelecky Dep.") at

84-88; Trifel Aff. ¶ 4, Ex. C at CMI002183-84; Doc. No. 58 at 3-4; Deutsch Decl.

¶¶ 4, 5, Exs. 3, 4.) After Country Mutual paid the above amounts for mitigation and

remediation, KRI requested additional coverage for mold testing. The record reflects that

KRI actually seeks coverage for mold testing as required by the City Building Official:

> Mold remediation required by the City Building Official. Dated
> June 30, 2010, the City of Cottage Grove (they perform inspections for the
> City of Newport), the Building Official wrote a letter to Mastercraft
> Construction Corporation asking, among other things, "that we receive a
> written report from your mold abatement contractor both prior to and upon
> completion". . . . This information is still needed by the Owner so as to be
> assured that all the mold in the building has been remediated. Unless all
> the mold is remediated, the mold could continue to multiply under the right
> conditions.

(Demand Letter at KRI000034 (Item 41).) Country Mutual denied the additional

coverage for mold testing, claiming it is not covered under the policy due to the Mold and

Ordinance Or Law exclusions in the Policy.

The Policy provides, in part:

> **c.** We will not pay under this **[Ordinance Or Law]** provision
> for:
>
> . . .
>
> **(2)** The costs associated with the enforcement of any
> ordinance or law which requires any insured or others
> to test for, monitor, clean up, remove, contain, treat,
> detoxify or neutralize, or in any way respond to, or
> assess the effects of "pollutants", "fungus", wet or dry
> rot or bacteria.

(Policy at 52.)

Under the Policy exclusion, and based on the record evidence, the Court concludes that KRI's request for additional mold testing to be paid for by Country Mutual was properly denied under the Ordinance Or Law exclusion. The Policy excludes coverage for mold testing due to enforcement of an ordinance or law, which is what KRI seeks coverage for here.

The Policy does cover testing for mold if "there is a reason to believe that 'fungus', wet or dry rot or bacteria are present." (*Id.* at 73.) In order for KRI to be entitled to coverage for mold testing under this provision, it must demonstrate an objective basis for a "reason to believe" that mold exists. KRI's claim that there is a likelihood that mold exists at the Property is not supported by the record. KRI does not point to record evidence that would support a reasonable belief that mold is still present; instead, KRI relies on the conclusory statements made by Richard Werner and Clifford Olson that speak to the extent of the water damage on the Property and the development of mold generally. (Werner Aff. ¶ 9; Doc. No. 60, Olson Aff. ¶¶ 7-9.) However, the record demonstrates that KRI's contractor removed and remediated for mold found on the Property after the storm. KRI offers no evidence that there is reason to believe that there is currently mold on the Property, nearly two years after the repairs were completed. Neither Werner nor Olson speak specifically to the likelihood of the presence of mold *after* the repairs and remediation paid for by Country Mutual.

Based on the record before the Court, KRI has not submitted evidence supporting an objective reason to believe that mold exists on the Property. Therefore, no reasonable

juror could conclude that Country Mutual is obligated to pay for the mold testing that KRI requests. Thus, KRI's breach of contract claim with respect to coverage for mold testing is properly dismissed on summary judgment.

## ORDER

Based upon the foregoing, **IT IS HEREBY ORDERED** that:

1.    Country Mutual's Motion for Summary Judgment (Doc. No. [51]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.    Country Mutual is entitled to judgment on KRI's claims for additional coverage under the Policy for: (1) the Property's roof; (2) damage to HVAC units; (3) damage to wallpaper/paneling; (4) enlarging the attic scuttle hole; (5) repairing damage to awnings; (6) repairing light fixtures; (7) repairing drains; (8) providing lost income beyond December 31, 2010; (9) providing coverage for Business Personal Property Claims; and (10) providing coverage for additional mold testing.

    b.    Fact issues remain with respect to KRI's claims for coverage under the Policy for: (1) damage to windows; and (2) damage to bathroom vanities.

2.    KRI's Motion of Partial Summary Judgment (Doc. No. [56]) is **DENIED**.

Dated: November 27, 2013          s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   United States District Judge